IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

TRANSAMERICA PREMIER LIFE
INSURANCE COMPANY *et al.*
  *Plaintiffs*,

    v.

SELMAN & COMPANY, LLC
  *Defendant*.

Civil Action No. ELH-18-3962

## MEMORANDUM OPINION

In this breach of contract dispute, plaintiffs Transamerica Premier Life Insurance Company and Transamerica Financial Life Insurance Company (collectively, "Transamerica") have filed suit against defendant Selman & Company, LLC ("Selman"). ECF 1 ("Complaint"). Transamerica asserts the following causes of action: breach of contract (Count I); anticipatory breach of contract (Count II); and unjust enrichment (Count III). It also seeks compensatory damages, special damages, and injunctive relief. *Id.* at 23. Subject matter jurisdiction is founded on diversity of citizenship. *Id.* ¶ 16.

Selman has moved to dismiss under Fed. R. Civ. P. 12(b)(6), for failure to state a claim. ECF 11. It is supported by a memorandum of law (ECF 11-1) (collectively, the "Motion"), and several exhibits. ECF 11-2 to ECF 11-8. Transamerica opposes the Motion. ECF 17 (the "Opposition"). Selman has replied. ECF 18 ("Reply").

The Motion is fully briefed and no hearing is necessary to resolve it. *See* Local Rule 105.6. For the reasons that follow, I shall deny the Motion.

## I.  Factual Summary

Transamerica is a national insurance company that underwrites an assortment of insurance products. ECF 1, ¶ 1. It offered several insurance products through Selman, a broker and third-

party administrator of insurance products. *Id.* ¶ 2. Of relevance here, Transamerica underwrote TRICARE Supplement policies which were offered through Selman.

TRICARE is the Department of Defense's health care insurance program for over nine million active duty and retired military members and their families. *Id.* ¶ 30. A TRICARE Supplement is a voluntary benefit insurance plan that covers out-of-pocket costs, such as co-payments or excess charges, not covered by TRICARE. *Id.* ¶ 31. Selman marketed and administered those plans. *Id.*

Three sets of contracts govern the relevant terms of the business relationship of the parties: (1) the 2002 Administrative Service and Marketing Agreement ("ASMA"); (2) two agreements Selman acquired from another administrator in 2014; and (3) a 2016 Amendment to the 2002 Administrative Service and Marketing Agreement.

### A.    The Administrative Service and Marketing Agreement

Transamerica and Selman entered into the ASMA (ECF 11-2), effective August 1, 2002. *See* ECF 1, ¶ 23.[1] The ASMA defines "the parties' rights and obligations concerning Selman's management, administration, and marketing of a series of insurance policies underwritten by Transamerica." *Id.* ¶ 24. Specifically, the ASMA governs Selman's administration of the Transamerica insurance policies identified in "Exhibit A," which is appended to the ASMA. *Id.* ¶¶ 24-25. These policies include Medicare Supplement products, term life products, and retiree medical products, among others. *Id.* ¶ 25. When the parties executed the ASMA in 2002,

---

[1] "Monumental Life Insurance Company was a party to, and signatory of, the ASMA. In 2014, Monumental changed its name to Transamerica Premier Life Insurance Company. This transition reflected a name change only, not an acquisition or other corporate transaction." ECF 1 at 6 n. 2.

Exhibit A did not include TRICARE Supplement policies and therefore the ASMA did not govern them. *See id.* ¶ 69.[2]

In its recitals, the ASMA includes an incorporation clause providing that the ASMA "supersedes and replaces all previous agreements, written and oral, and amendments by and between [Selman] and [Transamerica] with respect to the accounts listed in Exhibit A attached hereto." ECF 11-2 at 2. Significantly, the ASMA does not contain an exclusivity clause. ECF 1, ¶ 27; *see also* ECF 11-2. Rather, it provides: "Nothing in this Agreement shall be construed to prevent or restrict the ability of [Selman], the policyholder or sponsor to terminate any particular [Transamerica] insurance policy." ECF 11-2 at 8. Further, it provides that, in "the event of such termination," Transamerica shall cooperate with [Selman] in the transfer of coverage . . . to another insurance company if requested by [Selman]." *Id.* The ASMA also provides that the "insured records shall become the sole property of [Selman] upon termination of this Agreement." *Id.* at 9.

## B. The Two Acquired Agreements

Transamerica entered two agreements with the Association & Society Insurance Corporation ("ASIC"), which took effect on October 1, 2010: The Administrative Services Agreement (ECF 11-5, the "ASA") and the Marketing Services and Marketing Developmental Allowance Agreement. ECF 11-6 (the "Marketing Agreement"). In March 2014, ASIC assigned its rights and obligations under both agreements to Selman, with Transamerica's consent. *Id.* ¶¶ 34, 44; *see* ECF 11-4.

---

[2] However, as discussed, *infra*, in 2016 the parties amended the ASMA to add TRICARE Supplement policies to Exhibit A. *See* ECF 11-8.

## 1.      The Administrative Services Agreement

Pursuant to the ASA, Selman administers some Transamerica health plans, including TRICARE Supplements. *Id.* ¶ 35.  Selman agreed to "process applications of prospective insureds, issue certificates and policy documents, mail premium notices and collect premium payments, retain all records (including account documents, insurance applications, advertising materials, etc.), and serve as claims administrator." *Id.* ¶ 36.  In exchange, Selman was entitled to 27% of premiums collected on the TRICARE Supplement policies as well as other specified health plans. *Id.* ¶ 40.

Transamerica alleges that it provided Selman with significant confidential and proprietary information to help Selman successfully meet its contractual obligations. *Id.* ¶ 37. Specifically, Transmerica provided "customer leads, distribution channels, insured records, policy numbers, pricing structure, risk analysis, premium information, program performance reports, and other non-public information pertaining to Transmerica's TRICARE Supplement insurance policies and Transamerica's business operations[.]" *Id.* ¶ 37.

To protect confidential information, each party agreed to a confidentiality clause, providing that the parties would "not use nor sell, duplicate, dispose of, disseminate, publish, reproduce, disclose (either orally or in writing) or otherwise make available in any manner whatsoever . . . any Confidential Information belonging to the other party, unless prior written permission to do so from an authorized officer of the other party is first obtained." ECF 11-5 at 12, ¶ 7.01(d) ("Confidentiality Clause"); ECF 1, ¶ 38.  Further, each party acknowledged that a breach of the Confidentiality Clause would "cause immediate and irreparable harm to the other party" and entitle the other party to seek injunctive relief.  ECF 11-5 at 13, ¶ 7.01(i); *see also* ECF 1, ¶ 39.

## 2.     The Marketing Agreement

Under the Marketing Agreement, Selman is obligated to market and sell health plans, including TRICARE Supplement plans.  *Id.* ¶¶ 45-46. Pursuant to the Marketing Agreement, Selman is obligated to "solicit consumers for enrollment in the TRICARE Supplement plans, distribute promotional materials relating to the insurance plans underwritten by Transamerica, and engage in all efforts to market and grow Transamerica's TRICARE Supplement business."  *Id.* ¶ 46. In exchange, Selman is entitled to 2% of the premiums collected from all of Transamerica's TRICARE Supplement policies.  *Id.* ¶¶ 54-56.

Plaintiff asserts that the parties negotiated an Exclusivity Clause (ECF 11-6 at 4) as a material term of the Marketing Agreement.  *Id.* ¶ 51.  It provides, ECF 11-6 at 4 (my alterations):

14. The following exclusivity provisions shall apply while this Agreement is in force:

   (a)  [Selman] has the exclusive right to market the Tricare employer payroll deduction and cafeteria plan ("Payroll Plan") business on behalf of [Transamerica's] business unit known as Transamerica Affinity Services, Inc. ("Transamerica"), provided [Selman] maintains a minimum annualized premium in force of twenty million dollars ($20,000,000.00) of Tricare Payroll Plan business with [Transamerica]. Transamerica agrees not to aid any other business unit or other corporate affiliate that is competing with [Selman] for any Tricare Payroll Plan business. This exclusive right is granted only by Transamerica Affinity Services, Inc., and does not apply to any other business unit, division, or affiliated entity of [Transamerica];

   (b)  [Transamerica] shall have the exclusive right to underwrite and provide coverage for [Selman's] Tricare Payroll Plan business and [Selman] shall not engage directly or indirectly with any other insurance carrier or other entity to provide [Selman's] Tricare Payroll Plan product;

   (c)  Transamerica shall not, without the prior written consent of [Selman], engage directly or indirectly with any other entity or person for that entity or person to provide [Selman's] Tricare Payroll Plan product for or through Transamerica;

   (d)  As long as the minimum annual premium requirement as stated in paragraph 14(a) remains met, by mutual written agreement that specifically includes

> consent by [Selman] to the same, the Parties may agree upon terms and
> conditions that permit a third party to administer [Selman's] Tricare Payroll
> Plan business for Transamerica's client groups. Such agreement may
> include provision for compensation of [Selman] for consenting to the same
> for any coordination or participation by [Selman] in the services or
> transition thereby contemplated.

According to Transamerica, "the Tricare employer payroll deduction and cafeteria plan" refers to TRICARE Supplement plans for employers. ECF 1, ¶ 48. Transamerica and Selman provide other TRICARE Supplement plans to associations. *Id.* Therefore, the Exclusivity Clause applies only to TRICARE Supplement plans for employers and permits Selman to "market [Selman's] other insurance products for other carriers." *Id.* ¶ 57.

The Marketing Agreement includes a termination clause. *Id.* ¶ 58. It provides: "Either party may give written notice to the other terminating this Agreement, without cause, effective one hundred and eighty (180) days after the date of such notice. Unless otherwise terminated this Agreement shall remain in effect." ECF 11-6 at 5. According to Transamerica, the parties intended the 180-day period to allow them to plan for alternative arrangements. *Id.* ¶ 60. Notice would allow Selman to identify another carrier to underwrite its products and allow Transamerica to find another entity to administer and market its TRICARE Supplement plans. Transamerica alleges that the 180-day period was also intended to ensure that the non-terminating party receives its share of the premiums collected during the notice period. *Id.* ¶ 64.

### C.      Amendment No. 5 to the ASMA

In 2016, an internal third-party audit of Transamerica allegedly revealed that Transamerica was paying Selman compensation rates that were not reflected in the ASMA. *Id.* ¶ 79. As a result, Transamerica "prepared a revised compensation schedule that included, among other things, the TRICARE accounts that Selman purchased from ASIC for which Selman was receiving commissions." *Id.* ¶ 80. As a result, the parties entered into Amendment No. 5 to the ASMA,

effective May 1, 2016.  *Id.* ¶ 81; ECF 11-8 ("Amendment") at 2.  The Amendment deleted ASMA's Exhibit A in its entirety and replaced it with a new version. ECF 11-8, ¶ 1.  However, it also provided that "[a]ll other terms of the [ASMA] shall continue to remain in full force and effect. *Id.* ¶ 2.  Further, it specified: "Except as specifically amended hereby, the [ASMA] shall remain unmodified and in full force and effect and is hereby reaffirmed."  *Id.* ¶ 3.

Plaintiff alleges that the Amendment was intended only "to update the compensation schedule attached as Exhibit A to the ASMA to document all of the rates being paid to Selman." *Id.* ¶ 82.  Plaintiff also alleges that the parties did not intend to affect the ASA or the Marketing Agreement or to "modify the ASMA to govern the provision of the TRICARE Supplement plans." *Id.* ¶¶ 84-85.

Nevertheless, according to Transamerica, the parties continued to adhere to the agreements, including the Marketing Agreement's Exclusivity Clause, until the dispute at issue in this suit. *Id.* ¶¶ 71, 91.  Transamerica alleges that Selman has specifically referenced the Exclusivity Clause "on a number of occasions, including as recently as 2018, thereby acknowledging the effectiveness and enforceability of this arrangement." *Id.* ¶ 53.

### D.    The Alleged Breach and Anticipatory Breach

On November 14, 2018, Brian Healy, a National Practice Leader at Transamerica, dined with David Selman, the president of Selman, in Baltimore, Maryland.  *Id.* ¶ 94.  During the dinner, Mr. Selman "casually informed" Mr. Healy that Selman would be moving the TRICARE Supplement policies from Transamerica to the Hartford Insurance Company ("Hartford"), effective January 1, 2019.  *Id.* ¶ 95. In response to questions from Mr. Healy, Mr. Selman allegedly "acknowledged . . . the existence and enforceability of the [Marketing Agreement's] Exclusivity

[Provision], but implied . . . that the provision limited only Transamerica's rights to provide TRICARE Supplement coverage on behalf of agencies other than Selman." *Id.* ¶ 97.

Transamerica alleges that Selman and Hartford had been in discussions regarding Selman moving its TRICARE Supplement business from Transamerica to Hartford. *Id.* ¶ 103. Further, Transamerica avers that by engaging in these discussions, Selman violated the Marketing Agreement's Exclusivity Clause. *Id.* ¶ 104. And, it asserts that, in the course of Selman's discussions with Hartford, Selman must have also violated the Marketing Agreement's confidentiality clause by disclosing confidential information, such as Transamerica's experience reports, rate structure, and plan design. *Id.* ¶ 105.

Transamerica sent Selman a cease and desist letter, claiming that Selman violated the Exclusivity Clause and demanding that Selman immediately stop taking actions to move the TRICARE Supplement business to Hartford. *Id.* ¶ 106. However, Selman did not comply with Transamerica's request. *Id.* ¶ 107.

### III.    Standard of Review

A defendant may test the legal sufficiency of a complaint by way of a motion to dismiss under Rule 12(b)(6). *In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017); *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165-66 (4th Cir. 2016); *McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010), *aff'd sub nom.*, *McBurney v. Young*, 569 U.S. 221 (2013); *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). A Rule 12(b)(6) motion constitutes an assertion by a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted."

Whether a complaint states a claim for relief is assessed by reference to the pleading requirements of Fed. R. Civ. P. 8(a)(2). That rule provides that a complaint must contain a "short

and plain statement of the claim showing that the pleader is entitled to relief." The purpose of the rule is to provide the defendants with "fair notice" of the claims and the "grounds" for entitlement to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).

To survive a motion under Fed. R. Civ. P. 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570; *see Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009) (citation omitted) ("Our decision in *Twombly* expounded the pleading standard for 'all civil actions' . . . ."); *see also Willner v. Dimon*, 849 F.3d 93, 112 (4th Cir. 2017). But, a plaintiff need not include "detailed factual allegations" in order to satisfy Rule 8(a)(2). *Twombly*, 550 U.S. at 555. Moreover, federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby*, *Miss.*, 574 U.S. ___, 135 S. Ct. 346, 346 (2014) (per curiam).

Nevertheless, the rule demands more than bald accusations or mere speculation. *Twombly*, 550 U.S. at 555; *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013). If a complaint provides no more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action," it is insufficient. *Twombly*, 550 U.S. at 555. Rather, to satisfy the minimal requirements of Rule 8(a)(2), the complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (internal quotation marks omitted).

In reviewing a Rule 12(b)(6) motion, a court "must accept as true all of the factual allegations contained in the complaint" and must "draw all reasonable inferences [from those facts] in favor of the plaintiff." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440

(4th Cir. 2011) (citations omitted); *see Semenova v. MTA*, 845 F.3d 564, 567 (4th Cir. 2017); *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015); *Kendall v. Balcerzak*, 650 F.3d 515, 522 (4th Cir. 2011), *cert. denied*, 565 U.S. 943 (2011). But, a court is not required to accept legal conclusions drawn from the facts. *See Papasan v. Allain*, 478 U.S. 265, 286 (1986). "A court decides whether [the pleading] standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to the legal remedy sought. *A Society Without a Name v. Virginia*, 655 F.3d 342, 346 (4th. Cir. 2011), *cert. denied*, 566 U.S. 937 (2012).

Courts ordinarily do not "'resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses'" through a Rule 12(b)(6) motion. *Edwards,* 178 F.3d at 243 (quoting *Republican Party v. Martin,* 980 F.2d 943, 952 (4th Cir. 1992)). However, "in the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint, the defense may be reached by a motion to dismiss filed under Rule 12(b)(6)." *Goodman v. Praxair, Inc.,* 494 F.3d 458, 464 (4th Cir. 2007) (en banc); *accord Pressley v. Tupperware Long Term Disability Plan,* 553 F.3d 334, 336 (4th Cir. 2009). Because Rule 12(b)(6) "is intended [only] to test the legal adequacy of the complaint," *Richmond, Fredericksburg & Potomac R.R. Co. v. Forst,* 4 F.3d 244, 250 (4th Cir. 1993), "[t]his principle only applies . . . if all facts necessary to the affirmative defense 'clearly appear[ ] *on the face of the complaint.'" Goodman,* 494 F.3d at 464 (quoting *Forst,* 4 F.3d at 250) (emphasis added in *Goodman* ).

"Generally, when a defendant moves to dismiss a complaint under Rule 12(b)(6), courts are limited to considering the sufficiency of allegations set forth in the complaint and the 'documents attached or incorporated into the complaint.'" *Zak v. Chelsea Therapeutics Int'l, Ltd.*,

780 F.3d 597, 606 (4th Cir. 2015) (quoting *E.I. du Pont de Nemours & Co.*, 637 F.3d at 448). The court "may not consider any documents that are outside of the complaint, or not expressly incorporated therein . . . ." *Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 557 (4th Cir. 2013). But, under limited circumstances, when resolving a Rule 12(b)(6) motion, a court may consider documents beyond the complaint without converting the motion to dismiss to one for summary judgment. *Goldfarb v. Mayor & City Council of Baltimore*, 791 F.3d 500, 508 (4th Cir. 2015).

In particular, a court may properly consider documents that are "explicitly incorporated into the complaint by reference and those attached to the complaint as exhibits." *Goines*, 822 F.3d at 166 (citation omitted); *see also Six v. Generations Fed. Credit Union*, 891 F.3d 508, 512 (4th Cir. 2018); *U.S. ex rel. Oberg v. Pa. Higher Educ. Assistance Agency*, 745 F.3d 131, 136 (4th Cir. 2014); *Anand v. Ocwen Loan Servicing, LLC*, 754 F.3d 195, 198 (4th Cir. 2014); *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004), *cert. denied*, 543 U.S. 979 (2004); *Phillips v. LCI Int'l Inc.*, 190 F.3d 609, 618 (4th Cir. 1999). However, "before treating the contents of an attached or incorporated document as true, the district court should consider the nature of the document and why the plaintiff attached it." *Goines*, 822 F.3d at 167 (citing *N. Ind. Gun & Outdoor Shows, Inc. v. City of S. Bend*, 163 F.3d 449, 455 (7th Cir. 1998)).

Of import here, "[w]hen the plaintiff attaches or incorporates a document upon which his claim is based, or when the complaint otherwise shows that the plaintiff has adopted the contents of the document, crediting the document over conflicting allegations in the complaint is proper." *Goines*, 822 F.3d at 167. Conversely, "where the plaintiff attaches or incorporates a document for purposes other than the truthfulness of the document, it is inappropriate to treat the contents of that document as true." *Id.*

A court may also "consider a document submitted by the movant that [is] not attached to or expressly incorporated in a complaint, so long as the document was integral to the complaint and there is no dispute about the document's authenticity." *Goines*, 822 F.3d at 166 (citations omitted); *see also Woods v. City of Greensboro*, 855 F.3d 639, 642 (4th Cir. 2017), *cert. denied*, ___ U.S. ___, 138 S. Ct. 558 (2017); *Oberg*, 745 F.3d at 136; *Kensington Volunteer Fire Dep't. v. Montgomery Cty.*, 684 F.3d 462, 467 (4th Cir. 2012). To be "integral," a document must be one "that by its 'very existence, *and not the mere information it contains*, gives rise to the legal rights asserted.'" *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F. Supp. 2d 602, 611 (D. Md. 2011) (citation omitted) (emphasis in original). *See also* Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.").

In addition, "a court may properly take judicial notice of 'matters of public record' and other information that, under Federal Rule of Evidence 201, constitute 'adjudicative facts.'" *Goldfarb*, 791 F.3d at 508; *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Katyle v. Penn Nat'l Gaming, Inc.,* 637 F.3d 462, 466 (4th Cir. 2011), *cert. denied*, 565 U.S. 825 (2011); *Philips v. Pitt Cty. Mem. Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009). But, under Fed. R. Evid. 201, a court may take judicial notice of adjudicative facts only if they are "not subject to reasonable dispute," in that they are "(1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."

Defendant has submitted seven exhibits. Five of them are integral to and explicitly discussed in the Complaint: The ASMA (ECF 11-2); Transamerica's March 17, 2014 Consent to the Assignment of the ASA (ECF 11-4); the ASA (ECF 11-5); the Marketing Agreement (ECF

11-6); and the Amendment to the ASMA (ECF 11-8). *See* ECF 1, ¶¶ 23-28 (ASMA); *id.* ¶¶ 33-42 (ASA); *id.* ¶ 34 (Consent to the Assignment of the ASA); *id.* ¶¶ 43-68 (Marketing Agreement); *id.* ¶¶ 79-93 (Amendment); *see also Trigon Healthcare, Inc.*, 367 F.3d at 234 (considering a contract at the 12(b)(6) stage because the contract was explicitly referred to and relied on in the complaint and there was no dispute about its authenticity).

Amendments One Through Four to the ASMA (ECF 11-3) were not referenced in or attached to the Complaint. Nevertheless, "the Court may consider [them] 'so long as [they are] integral to the complaint and authentic.'" *McPhee Elec. Ltd., LLC v. Signal Perfection Ltd.*, WDQ-10-0831, 2010 WL 3245423, at *1 (D. Md. Aug. 16, 2010) (quoting *Philips v. Pitt County Mem. Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009)) (my alterations). In my view, ECF 11-3 is integral to the Complaint because it is incorporated into the ASMA. Moreover, its authenticity is not in dispute.

Like the Amendments, the March 17, 2014 Agreement to Supplant ASIC Agreements (ECF 11-7) (the "March 2014 Agreement") also was not referenced in or attached to the Complaint. However, the March 2014 Agreement is not integral to the Complaint and is not incorporated into any other agreement. Accordingly, I may not consider it.

## IV.    Choice of Law

In regard to state law claims under diversity jurisdiction, federal courts apply federal procedural law and the substantive law of the state in which the proceeding is brought. *See, e.g.*, *Erie R.R. v. Tompkins*, 304 U.S. 64, 78 (1938); *Leichling v. Honeywell Intern., Inc.*, 842 F.3d 848, 851 (4th Cir. 2016); *see also Kerr v. Marshall Univ. Bd. of Governors*, 824 F.3d 62, 74 (4th Cir. 2016); *Colgan Air, Inc. v. Raytheon Aircraft Co.*, 507 F.3d 270, 275 (4th Cir. 2007); 19 WRIGHT & MILLER, FED. PRACTICE & PROCEDURE § 4501 (3d ed.). And, federal courts apply the

choice of law rules of the state in which the court sits. *See, e.g.*, *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496-97 (1941); *Albemarle Corp. v. AstraZeneca UK Ltd.*, 628 F.3d 643, 652-53 (4th Cir. 2010); *see also Prof'l Massage Training Cent., Inc. v. Accreditation All. of Career Schs. & Colls.*, 781 F.3d 161, 180 (4th Cir. 2015); *Demetres v. E. W. Const. Inc.*, 776 F.3d 271, 273 (4th Cir. 2015).

In a contract claim, Maryland courts follow the rule of *lex loci contractus*, applying the substantive law of the state where the contract was formed, unless there is a choice-of-law provision in the contract. *Erie Ins. Exch. v. Heffernan*, 399 Md. 598, 925 A.2d 636, 648-49 (2007); *Am. Motorists Ins. Co. v. ARTRA Group, Inc.*, 338 Md. 560, 573, 659 A.2d 1295, 1301 (1995); *see also Cunningham v. Feinberg*, 441 Md. 310, 326, 107 A.3d 1194, 1204 (2015); *Lewis v. Waletzky*, 422 Md. 647, 657 n.8, 31 A.3d 123, 129 n.8 (2011). Here, each of the contracts in issue contains a choice-of-law provision stating that Maryland law governs the agreement. ECF 1, ¶¶ 28, 42, 68; *see* ECF 11-2 at 10; ECF 11-5 at 15; ECF 11-6 at 6. Accordingly, I will apply Maryland law.

## V. Discussion

### A. Principles of Contract Construction

In general, a contract is defined as "a promise or set of promises for breach of which the law gives a remedy, or the performance of which the law in some way recognizes as a duty." RICHARD A. LORD, 1 WILLISTON ON CONTRACTS § 1:1, at 2-3 (4th ed. 1990); *accord* Restatement (Second) Contracts § 1, at 5 (1981); *see also Maslow v. Vanguri*, 168 Md. App. 298, 321, 896 A.2d 408, 421-22, *cert. denied*, 393 Md. 478, 903 A.2d 416 (2006). "'A contract is formed when an unrevoked offer made by one person is accepted by another.'" *Cty. Comm'rs for Carroll Cty. v. Forty W. Builders, Inc.*, 178 Md. App. 328, 377, 941 A.2d 1181, 1209 (2008) (quoting *Prince George's County v. Silverman*, 58 Md. App. 41, 57, 472 A.2d 104, 112 (1984)). Thus, mutual

assent is an integral component of every contract. *See, e.g.*, *Joseph Saveri Law Firm Inc. v. Michael E. Criden, P.A.*, 759 F. App'x 170, 173 (4th Cir. 2019) (recognizing as a "bedrock principle of law" that an offeree must accept an offer to form a contract); *Cochran v. Norkunas*, 398 Md. 1, 14, 919 A.2d 700, 708 (2007); *Advance Telecom Process LLC v. DSFederal, Inc.*, 224 Md. App. 164, 177, 119 A.3d 175, 183 (2015).

In determining whether there is an enforceable contract, courts begin the analysis "by discussing the essential prerequisite of mutual assent to the formation of a contract . . . ." *Falls Garden Condo. Ass'n, Inc. v. Falls Homeowners Ass'n, Inc.*, 441 Md. 290, 302, 107 A.3d 1183, 1189 (2015); *see also Mitchell v. AARP*, 140 Md. App. 102, 116, 779 A.2d 1061, 1069 (2001) ("An essential element with respect to the formation of a contract is 'a manifestation of agreement or mutual assent by the parties to the terms thereof; in other words, to establish a contract the minds of the parties must be in agreement as to its terms.'" (citations omitted)). "Manifestation of mutual assent includes two issues: (1) intent to be bound, and (2) definiteness of terms." *Cochran*, 398 Md. at 14, 919 A.2d at 708.

A contract may be oral or written, as well as express or implied. "'An express contract has been defined as an actual agreement of the parties, the terms of which are openly uttered or declared at the time of making it, being stated in distinct and explicit language, either orally or in writing.'" *Maryland Cas. Co. v. Blackstone Int'l Ltd.*, 442 Md. 685, 706, 114 A.3d 676, 688 (2015) (quoting *Cty. Comm'rs of Caroline Cty v. Roland Dashiell & Sons, Inc.*, 358 Md. 83, 94, 747 A.2d 600, 606 (2000)). Whether oral or written, a contract must express with certainty the nature and extent of the parties' obligations and the essential terms of the agreement. *Forty W. Builders*, 178 Md. App. at 377-78, 941 A.2d at 1209-10; *see Canaras v. Lift Truck Services*, 272 Md. 337, 346, 322 A.2d 866, 871 (1974). If an agreement omits an important term, or is otherwise too vague or

indefinite with respect to an essential term, it is not enforceable. *Mogavero v. Silverstein*, 142 Md. App. 259, 272, 790 A.2d 43, 51 (2002); *see L & L Corp. v. Ammendale*, 248 Md. 380, 385, 236 A.2d 734, 737 (1967); *Schloss v. Davis*, 213 Md. 119, 123, 131 A.2d 287, 290 (1956) (stating that a "contract may be so vague and uncertain as to price or amount as to be unenforceable").

"'The cardinal rule of contract interpretation is to give effect to the parties' intentions.'" *Dumbarton Imp. Ass'n. Inc. v. Druid Ridge Cemetery Co.*, 434 Md. 37, 51, 73 A.3d 224, 232 (2013) (citation omitted). To determine the parties' intention, courts look first to the written language of the contract. *Walton v. Mariner Health of Maryland, Inc.*, 391 Md. 643, 660, 894 A.2d 584, 594 (2006) ("[G]enerally, when seeking to interpret the meaning of a contract our search is limited to the four corners of the agreement."); *Hartford Acc. & Indem. Co. v. Scarlett Harbor Assoc. Ltd. P'ship*, 109 Md. App. 217, 291, 674 A.2d 106, 142 (1996) ("[T]he court must, as its first step, determine from the language of the agreement what a reasonable person in the position of the parties would have meant at the time the agreement was effectuated."), *aff'd,* 346 Md. 122, 695 A.2d 153 (1997).

Under Maryland law, the interpretation of a contract is "ordinarily a question of law for the court." *Grimes v. Gouldmann*, 232 Md. App. 230, 235, 157 A.3d 331, 335 (2017); *see also Spacesaver Sys., Inc. v. Adam*, 440 Md. 1, 7, 98 A.3d 264, 268 (2014); *Myers v. Kayhoe*, 391 Md. 188, 198, 892 A.2d 520, 526 (2006); *Towson Univ. v. Conte*, 384 Md. 68, 78, 862 A.2d 941, 946 (2004); *Lema v. Bank of Am., N.A.*, 375 Md. 625, 641, 826 A.2d 504, 513 (2003); *Under Armour, Inc. v. Ziger/Snead, LLP*, 232 Md. App. 548, 552, 158 A.3d 1134, 1136 (2017).

"Maryland courts interpreting written contracts have long abided by the law of objective contract interpretation, which specifies that 'clear and unambiguous language' in an agreement 'will not give way to what the parties thought the agreement meant or was intended to

mean.'" *Urban Growth Prop. Ltd. P'ship v. One W. Balt. St. Assocs. LLC*, No. 882, Sept. Term, 2015, 2017 WL 526559, at *5 (Md. Ct. Spec. App. Feb. 9, 2017) (citation omitted) (unpublished); *see Cochran*, 398 Md. at 16, 919 A.2d at 709; *Huggins v. Huggins & Harrison, Inc.*, 220 Md. App. 405, 417, 103 A.3d 1133, 1139 (2014) (internal quotations and alteration omitted). The court's "task, therefore, when interpreting a contract, is not to discern the actual mindset of the parties at the time of the agreement." *Dumbarton*, 434 Md. at 52, 73 A.3d at 232. Rather, the court is to "'determine from the language of the agreement itself what a reasonable person in the position of the parties would have meant at the time it was effectuated.'" *Id.* (quoting *Gen. Motors Acceptance v. Daniels*, 303 Md. 254, 261, 492 A.2d 1306, 1310 (1985)).

To determine the parties' intention, courts first look to the written language of the contract. *See Walton*, 391 Md. at 660, 894 A.2d at 594. "'The words employed in the contract are to be given their ordinary and usual meaning, in light of the context within which they are employed.'" *DIRECTV, Inc. v. Mattingly*, 376 Md. 302, 313, 829 A.2d 626, 632-33 (2003) (citations omitted). A court will presume that the parties meant what they stated in an unambiguous contract, without regard to what the parties to the contract personally thought it meant or intended it to mean. *See Dumbarton*, 434 Md. at 51, 73 A.3d at 232; *Dennis v. Fire & Police Employees Ret. Sys.*, 390 Md. 639, 656, 890 A.2d 737, 747 (2006); *PaineWebber Inc. v. East*, 363 Md. 408, 414, 768 A.2d 1029, 1032 (2001); *see also, e.g.*, *Scarlett Harbor*, 109 Md. App. at 291, 674 A.2d at 142 ("Where the language of a contract is clear, there is no room for construction; it must be presumed that the parties meant what they expressed.").

The determination of whether a contract is ambiguous is a question of law. *Towson Univ.*, 384 Md. at 78, 862 A.2d at 946; *Sy-Lene of Wash., Inc. v. Starwood Urban Retail II, LLC*, 376 Md. 157, 163, 829 A.2d 540, 544 (2003). Notably, a contract is not ambiguous merely because

the parties do not agree on its meaning. *Fultz v. Shaffer*, 111 Md. App. 278, 299, 681 A.2d 568, 578 (1996). Rather, a contract is ambiguous "when the language of the contract is susceptible of more than one meaning to a reasonably prudent person." *Auction & Estate Representatives, Inc. v. Ashton*, 354 Md. 333, 340, 731 A.2d 441, 444-45 (1999); *see also Cochran*, 398 Md. at 17, 919 A.2d at 710; *Sy-Lene of Washington*, 376 Md. at 167, 829 A.2d at 547; *Calomiris v. Woods*, 353 Md. 425, 436, 727 A.2d 358, 363 (1999).

To determine whether a contract is ambiguous, a court considers "the character of the contract, its purpose, and the facts and circumstances of the parties at the time" that they enter into the contract. *Pacific Indem. Co. v. Interstate Fire & Cas. Co.*, 302 Md. 383, 388, 488 A.2d 486, 488 (1985). But, "'[i]f only one reasonable meaning can be ascribed to the [contract] when viewed in context, that meaning necessarily reflects the parties' intent.'" *Forty W. Builders*, 178 Md. App. at 377, 941 A.2d at 1209 (quoting *Labor Ready, Inc. v. Abis*, 137 Md. App. 116, 128, 767 A.2d 936, 942 (2001)).

Notably, a court will not "add or delete words to achieve a meaning not otherwise evident from a fair reading of the language used." *Brensdel v. Winchester Constr. Co.*, 392 Md. 601, 623, 898 A.2d 472, 485 (2006). Indeed, "[i]t is a fundamental principle of contract law that it is 'improper for the court to rewrite the terms of a contract, or draw a new contract for the parties, when the terms thereof are clear and unambiguous, simply to avoid hardships.'" *Calomiris v. Woods*, 353 Md. 425, 445, 727 A.2d 358, 368 (1999) (*quoting Canaras v. Lift Truck Servs.*, 272 Md. 337, 350, 322 A.2d 866, 873 (1974)); *see Loudin Ins. Agency, Inc. v. Aetna Cas. & Sur. Co.*, 966 F.2d 1443 (Table), 1992 WL 145269, at *5 (4th Cir. 1992) (per curiam) ("[A] court will not rewrite the parties' contract simply because one party is no longer satisfied with the bargain he struck.").

### B. Novation

Selman avers that the Amendment to the ASMA is a novation that supersedes and replaces the ASA and the Marketing Agreement. As noted, Selman allegedly violated the ASA's Confidentiality Clause and the Marketing Agreement's Exclusivity Clause. By contrast, the ASMA does not contain a confidentiality clause or an exclusivity clause. Therefore, if the Amendment to the ASMA supersedes the ASA and the Marketing Agreement, then Selman could transfer the TRICARE Supplement plans to Harford without breaching the ASA or the Marketing Agreement. ECF 11-1 at 12. That is, Transamerica's breach of contract and anticipatory breach of contract claims would fail. In response, Transamerica argues that Selman cannot establish the parties' intent to extinguish the ASA and Marketing Agreement and therefore the Court cannot find a novation. ECF 17 at 20-28.

"A novation is a new contractual relation and contains four essential requisites: (1) A previous valid obligation; (2) the agreement of all the parties to the new contract; (3) the validity of such new contract, and (4) the extinguishment of the old contract, by the substitution for it of the new one." *Leisner v. Finnerty*, 252 Md. 558, 564, 250 A.2d 641, 644 (1969) (quotation omitted); *see I. W. Berman Properties v. Porter Bros.*, 276 Md. 1, 7, 344 A.2d 65, 70 (1975). However, a novation "does not result from the substitution of one paper writing for another, or one evidence of debt for another, or one contract for another, unless such substitution is made with the intention of all the parties concerned to extinguish the old one. *Dist. Nat. Bank of Washington v. Mordecai*, 133 Md. 419, 427-28, 5 A. 586, 588 (1919).

The "standard for finding a novation under Maryland law is fairly stringent." *Corp. Healthcare Fin., Inc. v. BCI Holdings Co.*, CCB-05-3391, 2006 WL 1997126, at *7 (D. Md. July 13, 2006) (declining to find a novation at the preliminary injunction proceeding because "the court

would need further information about the circumstances surrounding" the applicable agreements). Indeed, "a novation is never presumed; the party asserting it must establish clearly and satisfactorily that there was an intention, concurred in by all the parties, that the existing obligation be discharged by the new obligation." *I. W. Berman Properties*, 276 Md. at 8, 344 A.2d at 70; *see Mordecai*, 133 Md. at 427-28, 105 A. at 588-89. The intention need not be expressly stated, however. "[F]acts and circumstances surrounding the transaction, as well as the subsequent conduct by the parties, may show such an acceptance as clearly as an express agreement; but such facts and circumstances, when shown, must be such to establish that the intention to work a novation is clearly implied." *Dahl v. Brunswick Corp.*, 277 Md. 471, 482, 356 A.2d 221, 227 (1976).

Selman argues that the parties' intent is clear from the face of the ASMA and the Amendment. ECF 11-1 at 13-14. When the parties executed the ASMA in 2002, they included an incorporation clause in the ASMA's recitals. It provides: "This [ASMA] supersedes and replaces all previous agreements, written and oral, and amendments by and between [Selman] and [Transamerica] with respect to the accounts listed in Exhibit A attached hereto." ECF 11-2 at 2. Nearly 14 years later, the parties executed the Amendment, adding new TRICARE Supplement plans to Exhibit A of ASMA. In Selman's view, if a new insurance policy is added to Exhibit A of the ASMA at any time, the ASMA's incorporation clause immediately supersedes all other agreements concerning the new policy. As a result, when the Amendment added the TRICARE Supplement plans to Exhibit A in 2016, the incorporation clause immediately superseded and replaced the ASA and the Marketing Agreement. ECF 11-1 at 13-14.

Defendant's argument is clever but ultimately not persuasive. At best, the text of the ASMA is ambiguous. The incorporation clause states that the ASMA "supersedes and replaces all

*previous* agreements[.]" ECF 11-2 at 1. This language can be fairly read—and is perhaps best read—to apply only to agreements executed *prior* to the execution of the ASMA in 2002. Because the ASA and the Marketing Agreement were executed in 2010, the ASMA's incorporation clause would not affect them. That is, they would not be superseded and replaced by the ASMA, as modified by the Amendment. Accordingly, the text of the ASMA fails to establish the parties' intention to replace the ASA and the Marketing Agreement.

Likewise, the extrinsic evidence surrounding the origins of the Amendment is disputed. The Complaint alleges that the Amendment was drafted as a result of an audit at Transamerica and was solely intended to account for compensation rates that were not reflected in the ASMA. *Id.* ¶¶ 79-85.

However, Selman provides a different account of the origins of the Amendment. It alleges that, "at the time of the 2014 assignment [of the ASA and Marketing Agreement], the parties entered another agreement [*i.e.*, the March 2014 Agreement] contemplating that the two contracts assigned from ASIC to Defendant would eventually be supplanted." ECF 11-1 at 8 (citing ECF 11-7). The March 2014 Agreement provided, ECF 11-7 at 3:

> [A]s soon as practical following the Closing [of the assignment], , [sic] but no later than October 1ˢᵗ 2014, the Administrative Services Agreement by and between Selman and the Transamerica Companies (Selman ASA) shall be amended to incorporate all of the insurance policies and groups covered by the ASA.
>
> . . . The [Marketing Agreement] shall be drafted as a separate stand-alone agreement for Selman with Transamerica Companies as soon as practical following the Closing, but no later than October 1, 2014.

Despite the agreement, the parties did not enter a new agreement before October 1, 2014. ECF 11-1 at 9. Selman seems to imply that the Amendment was meant to effectuate that earlier agreement. *Id.* at 9.

At this stage, I may not consider Selman's account, which rests on its own allegations as well as the March 2014 Agreement. ECF 11-7. Rather, I must accept "as true all of the factual allegations contained in the complaint" and "draw all reasonable inferences [from those facts] in favor of the plaintiff." *E.I. du Pont de Nemours & Co.*, 637 F.3d at 440. Accordingly, I cannot conclude that the parties intended to extinguish the ASA and the Marketing Agreement.

Moreover, even if the Court were to consider the extrinsic evidence introduced by Selman, it is ambiguous. The March 2014 Agreement, read in the light most favorable to the plaintiff, indicates only that the parties intended to keep the Marketing Agreement separate from the ASMA, not that the parties intended to subsume the Marketing Agreement into the ASMA. And, the Court cannot resolve any factual disputes or ambiguity at the motion to dismiss stage. *See 1899 Holdings, LLC v. 1899 Liab. Co.*, 568 Fed. Appx. 219, 224 (4th Cir. 2014) ("In a contract dispute, the construction of ambiguous contract provisions is a factual determination that precludes dismissal on a motion for failure to state a claim.") (internal quotation omitted); *Martin Marietta Corp. v. Int'l Telecomm. Satellite Org.*, 978 F.2d 140, 143 (4th Cir. 1992) (reversing trial court's grant of a motion to dismiss because the contract in issue was "not free of ambiguity"); *Hardwire LLC v. Goodyear Tire & Rubber Co.*, 360 F. Supp. 2d 728, 736 (D. Md. 2005) (holding that "an ambiguous contract provision is a factual determination that precludes dismissal on a motion for failure to state a claim").

In the alternative, Selman maintains that the Marketing Agreement and the ASA cannot coexist with the ASMA, as modified by the Amendment. As a result, Selman asserts that the Marketing Agreement and the ASA were replaced by the amended ASMA. Selman rests its argument on *Chew v. DeVries*, 240 Md. 216, 223, 213 A.2d 742, 746 (1965). There, the Maryland Court of Appeals concluded that when parties enter into a contract that "completely cover[s] the

subject-matter of [an earlier] contract and contain[s] terms so inconsistent therewith that the two could not stand together," then "the later contract 'rescinds, supersedes, and is substituted for the earlier contract, and becomes the only agreement of the parties on the subject.'" *Id.* at 223, 213 A.2d at 746 (quoting *Housekeeper Pub. Co. v. Swift*, 97 F. 290, 294 (8th Cir. 1899)).

However, the *Chew* Court also teaches that when faced with conflicting agreements, a court must first attempt to "effectuate the intention of the parties" and in so doing may consider evidence of extrinsic factors. *Id.* at 220-21, 213 A.2d at 744. These factors may include "negotiations of the parties, the circumstances surrounding execution of the contract[s], the parties' own construction of the contract[s] and the conduct of the parties." *Canaras v. Lift Truck Servs., Inc.*, 272 Md. 337, 351-52, 322 A.2d 866, 874 (1974).

As discussed, *supra*, the extrinsic evidence is conflicting and must be read in plaintiff's favor. As a result, at this juncture, it would be premature for the Court to conclude that the amended ASMA supersedes and replaces the ASA and the Marketing Agreement.

### C. Breach of Contract

Plaintiff asserts a claim for breach of contract, alleging that, by negotiating with Hartford, defendant violated the Exclusivity Clause in the Marketing Agreement (ECF 11-6 at 4) as well as the Confidentiality Clause in the ACA (ECF 11-5 at 11-13). ECF 1, ¶¶ 115-24. Additionally, plaintiff has lodged a claim for anticipatory breach of contract on the ground that Selman intended to transfer its TRICARE Supplement business to Hartford, effective January 1, 2019. As discussed, *supra*, defendant argues, unsuccessfully, that no breach of contract occurred because the parties entered a novation. ECF 11-1 at 12. Because the Court declines to find a novation at this juncture, plaintiff clearly states a viable claims for breach of contract and anticipatory breach of contract.

Under Maryland law, the elements of a claim for breach of contract are "'contractual obligation, breach, and damages.'" *Tucker v. Specialized Loan Servicing, LLC*, 83 F.Supp.3d 635, 655 (D. Md. 2015) (quoting *Kumar v. Dhanda,* 198 Md. App. 337, 17 A.3d 744, 749 (2011)). To "prevail in an action for breach of contract, a plaintiff must prove that the defendant owed the plaintiff a contractual obligation and that the defendant breached that obligation." *Taylor v. NationsBank, N.A.*, 365 Md. 166, 175, 776 A.2d 645, 651 (2001); *accord Belyakov v. Med. Sci. & Computing*, 86 F.Supp.3d 430, 437 (D. Md. 2015); *see also RRC Northeast, LLC v. BAA Maryland, Inc.*, 413 Md. 638, 658, 994 A.2d 430, 442 (2010). In other words, "[i]t is the parties' agreement that ultimately determines whether there has been a breach." *Mathis v. Hargrove*, 166 Md. App. 286, 318-19, 888 A.2d 377, 396 (2005).

In *Polek v. J.P. Morgan Chase Bank, N.A.*, 424 Md. 333, 362, 36 A.3d 399, 416 (2012), the Maryland Court of Appeals said: "Maryland law requires that a plaintiff alleging a breach of contract 'must of necessity allege with certainty and definiteness *facts* showing a contractual obligation owed by the defendant to the plaintiff and a breach of that obligation by defendant.'" (citation omitted) (emphasis in *Polek*); *see also Robinson v. GEO Licensing Co., L.L.C.*, 173 F. Supp. 2d 419, 423 (D. Md. 2001).

To establish an anticipatory breach of contract, "there must be a definite, specific, positive, and unconditional repudiation of the contract by one of the parties to the contract.'" *J.E. Dunn Const. Co. v. S.R.P. Dev. Ltd. P'ship*, DKC-11-1948, 2014 WL 3865993, at *5 (D. Md. Aug. 5, 2014) (quoting *C.W. Blomquist & Co., Inc. v. Capital Area Realty Investors Corp.*, 270 Md. 486, 494, 311 A.2d 787 (1973)); *see also BVR Dev., LLC v. CalAtlantic Grp., Inc.*, ADC-18-2039, 2019 WL 919560, at *7 (D. Md. Feb. 25, 2019). Indeed, Maryland law recognizes that "when 'in anticipation of the time of performance one definitely and specifically refuses to do something

which he is obligated to do, so that it amounts to a refusal to go on with the contract, it may be treated as a breach by anticipation, and the other party may, at his election, treat the contract as abandoned, and act accordingly.'" *C. W. Blomquist & Co.*, 270 Md. at 494, 311 A.2d at 791 (quoting *Friedman v. Katzner*, 139 Md. 195, 114 A. 884, 887 (1921)).

Pursuant to the Exclusivity Clause of the Marketing Agreement, Transamerica has "the exclusive right to underwrite and provide coverage for [Selman's] Tricare Payroll Plan business and [Selman] shall not engage directly or indirectly with any other insurance carrier or other entity to provide [Selman's] Tricare Payroll Plan product." ECF 11-6 at 4. Transamerica has alleged that Selman engaged in discussions with Hartford, an insurance carrier, to sell TRICARE Supplement plans to employers. *Id.* ¶ 103. Accordingly, plaintiffs have stated a plausible claim for breach of contract claim.

Transamerica also alleged that on "November 14, 2018, Selman advised Transamerica in positive and unconditional terms that it intends to divert roughly $30 million of TRICARE Supplement business to The Hartford, effective January 1, 2019." *Id.* ¶ 126. Indeed, in the Motion, Selman acknowledged the repudiation: "[I]n November 2018, Defendant informed Plaintiffs that it was exercising its option under the ASMA to move the Tricare business to another insurance provider effective January 1, 2019." ECF 11 at 10.

Accordingly, plaintiff has established "definite, specific, positive, and unconditional repudiation" of the Marketing Agreement, specifically its Exclusionary Clause. Accordingly, Transamerica has stated a claim for anticipatory breach of contract. However, because the anticipated breach in January 2019 have long since come and gone, the Court will construe this count as one for breach of contract.

### D.     Unjust Enrichment

Transamerica maintains that Selman has unjustly enriched itself by accepting and retaining "Transamerica's services, support, commission payments, and exclusivity . . . without payment or other inconsideration (including abiding by its exclusivity promises) for their value[.]" ECF 1, ¶ 142.   Selman argues that Transamerica's unjust enrichment claim must fail because Transamerica is a party to an express contract governing the subject matter of the claim. ECF 11-1 at 21. In its Opposition, Transamerica maintains that it may plead unjust enrichment in the alternative because the existence of the Marketing Agreement is disputed. ECF 17 at 38-39. Selman replies that the parties do not dispute *whether* a contract governs the subject matter, but *which* contract governs the subject matter.   ECF 18 at 23-24. Therefore, in Selman's view, irrespective of whether the Marketing Agreement or the ASMA applies, plaintiff cannot plead unjust enrichment.  *Id.*

Unjust enrichment is a quasi-contractual cause of action that is a remedy "'to provide relief for a plaintiff when an enforceable contract does not exist but fairness dictates that the plaintiff receive compensation for services provided.'"  *Dashiell*, 358 Md. at 96-97, 747 A.2d at 607 (quoting *Dunnaville v. McCormick & Co.*, 21 F. Supp. 2d 527, 535 (1998)).  "The general rule is that no quasi-contractual claim can arise when a contract exists between the parties concerning the same subject matter on which the quasi-contractual claim rests."  *Id.* at 96, 747 A.2d at 607; *see also FLF, Inc. v. World Publications, Inc.*, 999 F. Supp. 640, 642 (1998) ("It is settled law in Maryland, and elsewhere, that a claim for unjust enrichment may not be brought where the subject matter of the claim is covered by an express contract between the parties.").

In Maryland, a claim of unjust enrichment is established when: "(1) the plaintiff confers a benefit upon the defendant; (2) the defendant knows or appreciates the benefit; and (3) the

defendant's acceptance or retention of the benefit under the circumstances is such that it would be inequitable to allow the defendant to retain the benefit without the paying of value in return." *Benson v. State*, 389 Md. 615, 651-52, 887 A.2d 525, 546 (2005) (citation omitted); *see also Hill v. Cross Country Settlements, LLC*, 402 Md. 281, 295, 936 A.2d 343, 351 (2007); *Dashiell*, 358 Md. at 95 n. 7, 747 A.2d at 607 n. 7; *Jackson v. 2109 Brandywine, LLC*, 180 Md. App. 535, 574, 952 A.2d 304, 327, *cert. denied*, 406 Md. 444, 959 A.2d 793 (2008); *Swedish Civil Aviation Admin. v. Project Mgmt. Enterprises, Inc.*, 190 F. Supp. 2d 785, 792-93 (D. Md. 2002).

"A person confers a benefit upon another if he gives to the other possession of or some other interest in money[.]" RESTATEMENT OF RESTITUTION § 1 cmt. b (1937, updated through 2019). An unjust enrichment claim deprives the defendant of benefits that would be inequitable for the defendant to retain. *Hill*, 402 Md. at 295, 936 A.2d at 352 (citation omitted). Therefore, the plaintiff may prevail even if the defendant "received those benefits quite honestly in the first instance, and even though the plaintiff may have suffered no demonstrable losses.'" *Id.* at 296, 936 A.2d at 352. "A person who receives a benefit by reason of an infringement of another person's interest, or of loss suffered by the other, owes restitution to him in the manner and amount necessary to prevent unjust enrichment." *Berry & Gould v. Berry,* 360 Md. 142, 151, 757 A.2d 108 (2000) (quoting RESTATEMENT (SECOND) OF RESTITUTION § 1 (Tentative Draft No. 1, 1983)); *see Bank of America Corp. v. Gibbons,* 173 Md. App. 261, 267, 918 A.2d 565, 569 (2007).

Notably, "'a plaintiff is not barred from pleading these theories in the alternative where the existence of a contract concerning the subject matter is in dispute.'" *Chubb & Son v. C & C Complete Servs., LLC*, 919 F. Supp. 2d 666, 678 (D. Md. 2013) (quoting *Vu Hoang v. Georgetown Contractors, Inc.*, AW-10-2117, 2010 WL 4485729, at *3 (D. Md. Nov. 9, 2010)).

At this juncture, the Court must construe all facts and conclusions in plaintiff's favor. *E.I.*

*du Pont de Nemours & Co.*, 637 F.3d at 440. Transamerica has plausibly alleged that Selman obtained the benefit of Transamerica's payments while violating its promises not to compete against Transamerica. ECF 1, ¶¶ 140-42. Defendant maintains that even if the Marketing Agreement does not govern the subject matter, the ASMA does. ECF 18 at 23-24. But, it would be premature for the Court to conclude, prior to discovery, that either the Marketing Agreement or the ASMA will necessarily govern the subject matter at issue.

It is certainly plausible that neither one will govern. Therefore, defendant's argument is unavailing at this early stage.

## VI.    Conclusion

For the foregoing reasons, defendant's Motion shall be denied. An Order follows.


Date:  July 9, 2019                                                    _____/s/_____
                                                                              Ellen Lipton Hollander
                                                                              United States District Judge